UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-10817-RGS

JEREMIAH and LAURA DAVILA-LYNCH

v.

CITY OF BROCKTON et al.

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

September 12, 2011

STEARNS, D.J.

Plaintiffs Jeremiah and Laura Davila-Lynch assert various state and federal civil

rights claims against the City of Brockton (the City) and two Brockton police officers,

Mark Celia and David Dickinson, arising out of the arrest of Jeremiah Davila-Lynch

on May 20, 2006.  Presently before the court is defendants' motion for summary

judgment.  The court heard oral argument on September 8, 2011.

BACKGROUND

The facts, in the light most favorable to plaintiffs as the nonmoving parties, are

as follows.[1]  Jeremiah Davila-Lynch is a Federal Air Marshal (FAM).  As part of his

---

[1] On summary judgment, the court is "obliged to review the record in the light
most favorable to the nonmoving party, and to draw all reasonable inferences in the
nonmoving party's favor." *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d  836, 841 (1st Cir.

duties, he was required to travel from Boston Logan International Airport (Logan) to London, England, on or about May 18, 2006.  He returned to Logan on May 19, 2006, at approximately 9:00 p.m.  Davila-Lynch traveled directly from the airport to a lounge in Brockton, where he met a friend, Terry Moreland.  While there, Davila-Lynch drank one bottle of Heineken beer over the course of an hour.  After leaving the lounge, Davila-Lynch stopped at Maui Restaurant on Main Street in Brockton, where he met another friend, Lamont Hicks.  Davila-Lynch remained at Maui's from approximately 11:00 p.m. until 2:00 a.m., during which time he drank a second beer.

While stopped at a red light after leaving Maui's to return home, Davila-Lynch saw a Brockton patrol car and a man on his knees, struggling with a uniformed Brockton police officer.  Davila-Lynch rolled down the window of his car and asked the officer if he needed help.  He could not make out the officer's response.  He drove to the next traffic light, made a left turn and circled the block.[2]  By the time he arrived back at the scene (three to five minutes later), a second police cruiser had arrived.

_____

1993).

[2] According to the Arrest Report submitted by defendants, Davila-Lynch was told to leave the scene, but stopped approximately 100 feet up the road where he began to yell at the officers.  Davila-Lynch allegedly then pulled away, activated his car's siren and wigwag lights, and drove through a red light, forcing other cars to swerve around him to avoid a collision.  Defs.' Mem. at 2 n.1, Ex. B (Arrest Report).  Davila-Lynch denies that any of this happened.

Davila-Lynch slowed his vehicle and again rolled down the window. One of the officers asked, "What the fuck are you doing? Fuck you." Davila-Lynch replied, "I couldn't hear you before." He then said something to the effect, "Okay. Fine. I guess you are okay," and began to drive away. As he did so, he heard an officer shout, "Stop that car." He then saw police lights and two cruisers closing in from behind. He pulled over and put his vehicle in park. Two officers approached. One asked Davila-Lynch, "Were you watching me? What did you see? Can I see your driver's license?" Davila-Lynch took out his wallet, which contained his driver's license and FAM credentials. The officer grabbed the wallet, revealing Davila-Lynch's FAM badge.[3]

Officer Baroud then asked Davila-Lynch if he had a gun with him. Davila-Lynch replied that he was carrying a firearm.[4] The officers then confiscated the gun and ordered Davila-Lynch out of his vehicle. They asked Davila-Lynch multiple times, "Are you working? Are you on duty right now? What did you see?" Davila-Lynch replied that he was not on duty.

---

[3] According to the Arrest Report, when Davila-Lynch was asked to produce his license and registration, officer Baroud observed that Davila-Lynch's "penis was hanging out fully exposed." *Id*. at Ex. B.

[4] Officer Baroud testified that Davila-Lynch gave a mumbled, non-coherent response. The Arrest Report states that Davila-Lynch's initial response was "No," and that "Officer Baroud asked an additional two times and the final answer was, 'Oh, a firearm, yes, I have one with me.'" *Id*.

3

Sergeant Celia then ordered officer Dickinson to administer a field sobriety test. Dickinson directed Davila-Lynch to perform four different sobriety tests, but does not remember which test, if any, Davila-Lynch failed.[5]  Davila-Lynch then heard Dickinson say to Celia, "He is okay," to which Celia replied, "Lock him up anyway."[6] Davila-Lynch became upset and asked, "What am I being charged with?"  Celia told him to "shut the fuck up," and called him a "monkey," which Davila-Lynch interpreted as a racial slur.[7]

Another officer told Davila-Lynch to calm down, and that "this guy [Celia] will hurt you," stating that Celia had "knocked somebody's eye out in the past."  Celia told Davila-Lynch to "shut up before I charge you with OUI [operating under the influence]."  Davila-Lynch was eventually charged with carrying a firearm while intoxicated, disturbing the peace, and interfering with a police officer.  He was also charged with a civil motor vehicle infraction for unlawfully operating his car's siren. On March 16, 2007, the charges were dismissed by the Brockton District Court.

As a result of the criminal charges, Davila-Lynch was immediately suspended

---

[5] A Breathalyzer test was not conducted.

[6] According to the Arrest Report, Dickinson stated that after administering the field sobriety tests, "he would not feel comfortable with" Davila-Lynch operating a motor vehicle or handling a firearm.  *Id.*

[7] Davila-Lynch is African-American.

from work.  He was then placed on leave without pay from October of 2006, through September of 2008, at which time he was reinstated (but was not given back pay or benefits).  Davila-Lynch claims that as a result of the incident he suffered emotionally, experiencing stress, problems with his wife and children, and difficulties in his friendships.  He further alleges that he was harmed professionally, and is now ineligible to apply for a supervisory job in the FAM service.

On May 18, 2009, Davila-Lynch and his wife, Laura, filed this action.  The Complaint sets out eleven counts: (1) federal civil rights violations pursuant to 42 U.S.C. § 1983 (against Celia and Dickinson); (2) conspiracy to violate the federal civil rights laws pursuant to 42 U.S.C. §§ 1983 and 1985 (against Celia and Dickinson); (3) violation of the federal civil rights laws pursuant to 42 U.S.C. § 1983 (against the City); (4) state civil rights violations pursuant to Mass. Gen. Laws ch. 12, §§ 11H and 11I (against Celia and Dickinson); (5) common-law conspiracy to violate the state civil rights laws pursuant to Mass. Gen. Laws ch. 12, § 11H (against Celia and Dickinson); (6) common-law false imprisonment (against all defendants); (7) common-law assault and battery (against all defendants); (8) intentional and/or negligent infliction of emotional distress (against all defendants); (9) malicious prosecution (against all defendants); (10) civil conspiracy (against all defendants); and (11) loss of consortium (Laura Davila-Lynch against all defendants).

On March 1, 2011, defendants filed this motion for summary judgment, arguing that "there is an absence of evidence to support the plaintiffs' claims." Defs.' Mem. at 5. Plaintiffs oppose the motion with respect to all counts save for the claim of malicious prosecution.[8]

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986). The moving party bears the burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).

### I. Qualified Immunity

Defendants first argue that Davila-Lynch's claims under 42 U.S.C §§ 1983 and 1985 must be dismissed because the defendant officers are entitled to qualified

---

[8] Plaintiffs' counsel stated in his brief and at the hearing that plaintiffs "have no objection to dismissal" of the malicious prosecution claim. Pls.' Mem. at 20.

immunity.[9]   Qualified immunity attaches to discretionary conduct of government officials that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   *See Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985) (officers immune unless their actions were "clearly proscribed" by established law).  "Immunity does not depend on the good faith or particular beliefs of the officer as to the state of the law; rather the test is objective." *Pasqualone v. Gately*, 422 Mass. 398, 402 (1996).  The line properly drawn is not between the constitutional and the unconstitutional, but between acts that although unconstitutional are nonetheless objectively reasonable and acts that are unconstitutional on their face.  *See Cox v. Hainey*, 391 F.3d 25, 31 (1st Cir. 2004).  "[T]he qualified immunity inquiry . . . allows . . . for the inevitable reality that '*law enforcement officials will in some cases reasonably but mistakenly conclude that [their conduct] is [constitutional], and . . . that . . . those officials* – like other officials who act in ways they reasonably believe to be lawful – *should not be held personally liable*.'"  *Hegarty v. Somerset Cnty.*, 53 F.3d 1367, 1373 (1st Cir. 1995), quoting *Anderson v. Creighton,* 483 U.S. 635, 641 (1987).

---

[9] A public official may also claim an immunity from suit under the Massachusetts Civil Rights Act patterned after immunity under the federal civil rights statutes.  *See Duarte v. Healy,* 405 Mass. 43, 46-47 (1989).  *See also Rodriques v. Furtado*, 410 Mass. 878, 881-882 (1991).

"Defendant police officers are shielded if *either* of the following holds: if the federal law allegedly violated was not clearly established at the time of the alleged violation, or if, at summary judgment, there is no genuine dispute of material fact that would prevent a finding that the defendants' actions, with regard to applying or following such clearly established law, were objectively reasonable." *Vargas-Badillo v. Diaz-Torres*, 114 F.3d 3, 5 (1st Cir. 1997). In assessing the defense, a court may choose to "first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999). The "threshold" question in this mode of analysis can be stated as follows: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? . . . If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[10]

---

[10] The Court had previously identified a particular value in this sequence of analysis. "Deciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Wilson v. Layne*, 526 U.S. 603, 609 (1999). *Saucier* elevated this "benefit" into a mandate under which lower courts were *always* to answer the constitutional question before asking whether the right asserted was "clearly established" law. However, in *Pearson v. Callahan*, 555 U.S. 223 (2009), the Court backed away, acknowledging that "[t]here are circumstances in which the first step of the *Saucier* procedure may create a risk of bad decisionmaking." *Id*. at 239. There are cases "in which a court will rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult

Davila-Lynch argues that the defendant officers are not entitled to qualified immunity because no jury could find that a reasonable officer would have had probable cause to arrest him on the facts as alleged.  "The Fourth Amendment right to be free from unreasonable seizures of the person demands that an arrest be supported by probable cause." *Santiago v. Fenton*, 891 F.2d 373, 383 (1st Cir. 1989), citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964).  "[T]here is no cause of action for 'false arrest' under § 1983 unless the arresting officer lacked probable cause." *Street v. Surdyka*, 492 F.2d 368, 372-373 (4th Cir. 1974).  The probable cause analysis entails "'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' and not on the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon*, 472 U.S. 463, 470-471 (1985), quoting *Scott v. United States*, 436 U.S. 128, 136 (1978).  Thus, a pretextual arrest, if supported by probable cause, will not support a claim of false arrest.  *Holland v. City of Portland*, 102 F.3d 6, 10 (1st Cir. 1996).   Similarly, so long as probable cause exists justifying an arrest for some offense, it is of no consequence that the basis stated by the arresting officer is legally invalid.  *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

---

question whether the relevant facts make out a constitutional question at all." *Id*.  A trial court, in other words, is at liberty to proceed in the sequence that seems most appropriate to the facts of the case at hand.  *Id*. at 242.

Probable cause exists where "the facts and circumstances within [the police officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense." *United States v. Figueroa*, 818 F.2d 1020, 1023 (1st Cir. 1987), quoting *Beck*, 379 U.S. at 91. "Probable cause determinations are, virtually by definition, preliminary and tentative." *Acosta v. Ames Dep' t Stores, Inc.*, 386 F.3d 5, 11 (1st Cir. 2004). "The exact degree of certainty required to establish probable cause is difficult to quantify; it falls somewhere between 'bare suspicion [and] what would be needed to justify . . . conviction.'" *Burke v. Town of Walpole*, 405 F.3d 66, 80 (1st Cir. 2005), quoting *Valente v. Wallace*, 332 F.3d 30, 32 (1st Cir. 2003). "When the constitutional validity of an arrest is challenged, it is the function of a court to determine whether the facts available to the officers at the moment of the arrest would 'warrant a man of reasonable caution in the belief' that an offense has been committed." *Beck*, 379 U.S. at 96. "The only relevant facts are those known to the officer. When these facts are in reasonable dispute, the fact-finder must resolve the dispute. However, when the underlying facts claimed to support probable cause are not in dispute, whether those 'raw facts' constitute probable cause is an issue of law . . . ." *Holder v. Town of Sandown*, 585 F.3d 500, 504 (1st Cir. 2009) (internal citation omitted). *See also Ornelas v. United States*, 517 U.S. 690, 696-697 (1996).

Defendants maintain that they had probable cause to arrest Davila-Lynch for unlawfully carrying a firearm while under the influence of intoxicating liquor, a misdemeanor under state law. *See* Mass. Gen. Laws ch. 269, § 10H. Defendants rely on their assertion that Davila-Lynch appeared to be intoxicated during the encounter, as well as officer Dickinson's purported lack of comfort in allowing Davila-Lynch to remain in possession of a loaded firearm. These are, however, heavily disputed "facts." Davila-Lynch did admit at his deposition to drinking two beers over the course of approximately five hours. At oral argument, counsel for defendants argued that this fact alone could support the officers' claim of probable cause to arrest Davila-Lynch for carrying a firearm while intoxicated, as "intoxication" is not defined in the statute. *See id.* ("Whoever, having in effect a license to carry firearms . . . carries on his person, or has under his control in a vehicle, a loaded firearm, as defined in section 121 of said chapter 140, while under the influence of intoxicating liquor or marijuana . . . shall be punished by a fine of not more than $5,000 or by imprisonment in the house of correction for not more than two and one-half years, or by both such fine and imprisonment.").

In the absence of any decided cases, there are two ways to interpret the statute's reference to intoxicating liquor. At common law, the term "intoxication" is equated with drunkenness. *See Black's Law Dictionary* 841 (8th ed. 2004) ("[I]ntoxication.

11

A diminished ability to act with full mental and physical capabilities because of alcohol or drug consumption; drunkenness."). The statutory term "under the influence" as used in the drunk driving laws "connotes a less disabled state than drunkenness." *Commonwealth v. Cochran*, 25 Mass. App. Ct. 260, 260 n.1 (1998). It does require a showing, however, that the consumption of alcohol affected a person's faculties in such a way as to diminish his ability (in this case) to safely act as the custodian of a firearm. *See Commonwealth v. Connolly*, 394 Mass. 169, 173 (1985); *Commonwealth v. Haley*, 23 Mass. App. Ct. 10, 13 (1986).

The disputes of fact are these. If Davila-Lynch had consumed (as he testifies) two beers over the course of approximately five hours, it would have been physiologically impossible for him to have been drunk or "under the influence of intoxicating liquor" at the time the incident occurred, given the rate at which the male body absorbs and eliminates alcohol. *See* Kurt Dubowski, *Human Pharmacokinetics of Ethanol. I. Peak Blood Concentrations and Elimination in Male and Female Subjects*, 5 Alcohol Technical Rep. 4, 55-63 (1976). More telling, the officers do not claim that they were aware of the fact that Davila-Lynch had consumed two beers prior to his arrest. (Davila-Lynch also asserts that he heard Dickinson tell Celia that he (Davila-Lynch) was "okay" after the field sobriety tests had been performed.) Thus, there is a genuine dispute of material fact as to whether the officers had reason to

believe that Davila-Lynch was intoxicated or under the influence at the time the arrest

was made, or whether the claim is an after-the-fact contrivance intended to cover up

the officer's unlawful conduct.[11]

## II.  Federal Conspiracy Claim

To state a claim for conspiracy under 42 U.S.C. § 1985(3), the following four

elements must be satisfied: "(1) two or more persons must conspire, (2) to deprive,

either directly or indirectly, any person or class of persons of the equal protection of

the laws or of equal privileges and immunities under the laws, (3) one or more of the

conspirators must have done or caused to be done an act in furtherance of the object

of the conspiracy, and (4) the plaintiff must have suffered either an injury to person or

property or a deprivation of a constitutionally protected right or privilege as a result of

---

[11] Similarly, there is a dispute of material fact as to whether the officers had probable cause to arrest Davila-Lynch for disturbing the peace and interfering with a police officer.  Defendants base this contention on their incident report stating that Davila-Lynch was taken into custody because he "injected himself into an arrest for which he was not involved, and after being told to drive on, instead stopped his vehicle 100 feet up the street and began yelling at the officers – all in the vicinity of other people walking by."  Defs.' Mem. at 8, Ex. B (Arrest Report).  As Davila-Lynch correctly points out, the Arrest Report is inadmissible hearsay as against him.  *See Kelly v. O'Neil*, 1 Mass. App. Ct. 313, 317 (1973); *Genova v. Genova*, 28 Mass. App. Ct. 647, 649 (1990).  Davila-Lynch testifies that he did not stop 100 feet up the road, nor did he yell back at the officers.  *See Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993) (where "there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them," the existence of probable cause for an arrest is an issue for the jury).

the conspiracy." *Andrade v. Jamestown Hous. Auth.*, 82 F.3d 1179, 1192 (1st Cir. 1996). Davila-Lynch, for his part, contends that the conduct of Celia and Dickinson evidences an agreement to deprive him of his right to equal protection, insofar as Dickinson complied with Celia's order to "lock him up anyway," even though he appeared to be "okay." Davila-Lynch further contends that Celia's racist comment demonstrated an intent to arrest him based on racial animus, rather than probable cause. *See Alexis v. McDonald's Rests. of Massachusetts, Inc.*, 67 F.3d 341, 354 (1st Cir. 1995) (if an arrest, even where supported by probable cause, would not have been made but for a plaintiff's race, he or she will have a viable claim under the Equal Protection Clause). Here, there is a genuine dispute of material fact as to whether the officers had a meeting of the minds to unlawfully arrest Davila-Lynch based on his race.

### III. Claims Against the City

To establish municipal liability for constitutional violations committed by a city's employees or agents, "[t]he alleged municipal action at issue must constitute a 'policy or custom' attributable to the City. Further, the Supreme Court has imposed two additional requirements: 1) that the municipal policy or custom actually have caused the plaintiff's injury, and 2) that the municipality possessed the requisite level of fault, which is generally labeled in these sorts of cases as 'deliberate indifference.'" *Young*

*v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 26 (1st Cir. 2005) (citations

omitted).  *See also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

There is an additional requirement.   Because of the causation element, the

doctrines of respondeat superior and vicarious liability have no place in a § 1983

municipal action – a municipality cannot be held liable simply because it employs a

tortfeasor.  *Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 121 (1992).  Thus,

where there is a finding of no liability on the part of the municipal actor, there can be

no finding of liability against the municipality itself.  *See City of Los Angeles v. Heller*,

475 U.S. 796, 799 (1986) (per curiam) (verdict in favor of defendant officer on

plaintiff's excessive force claim precluded liability on the part of his supervisors and

employer); *Evans v. Avery*, 100 F.3d 1033, 1039-1040 (1st Cir. 1996) (applying *Heller*

to municipal liability generally).  This principle is as true of injunctive and declaratory

relief as it is of money damages.  *See Los Angeles Cnty., California v. Humphries*, 131

S. Ct. 447, 452-453 (2011).  In recognition of this principle, courts will commonly

bifurcate the consideration of any municipal claim until after the trial of the underlying

claim of a constitutional violation.  As a matter of judicial economy, this makes sense:

a second trial is necessary only if a violation is established and then, only if the

municipality declines to satisfy the underlying judgment (which in the court's

experience is rarely, if ever, the case).  *See Wilson v. Town of Mendon*, 294 F.3d 1, 7 (1st Cir. 2002).  This "familiar path" is the one the court will trod in this case.

## IV.  False Imprisonment

"The tort of false imprisonment consists in the (1) intentional and (2) unlawful (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement."  *Noel v. Town of Plymouth*, 895 F. Supp. 346, 354 (D. Mass. 1995), citing *Santiago*, 891 F.2d at 383 (1st Cir. 1989).  *See also Wax v. McGrath*, 255 Mass. 340, 342 (1926) (unlawful restraint by force or threat constitutes false imprisonment).  False arrest is a species of the tort of false imprisonment.  *See Wallace v. Kato*, 549 U.S. 384, 391 (2007).

Here, the false imprisonment claim hinges on the determination of whether the officers had probable cause to arrest Davila-Lynch.  As discussed previously, there is a genuine dispute of material fact as to whether the officers had probable cause (or reason to believe that they had probable cause) to arrest Davila-Lynch, a dispute that precludes a grant of summary judgment on this claim.[12]  *Cf. Santiago*, 891 F.2d at 386 (holding that a jury question existed as to whether a police officer had common-law immunity in a false arrest action, where the arrestee alleged that he was arrested either

_____

[12] As discussed at oral argument, the false imprisonment claim, while valid, is duplicative of the § 1983 claim.  Counsel for plaintiffs agreed to consider dropping this claim prior to trial.

to cover up the use of excessive force or to satisfy a personal grudge held by a fellow officer).

## V.  Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress, a plaintiff must show that: (1) the defendant intended to inflict emotional distress or knew or should have known that emotional distress was a likely result of his conduct; (2) the conduct complained of was "extreme and outrageous," and beyond all possible bounds of decency" so as to be "utterly intolerable in a civilized community"; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was "severe" and of a nature "that no reasonable [person] could be expected to endure." *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144-145 (1976) (internal citations omitted).

Although defendants make no argument as to why this Count should be dismissed, the court will (as it indicated it would at the hearing) dismiss this claim as a matter of law.  Being placed under arrest, without more, particularly when viewed from the perspective of a reasonable actor who himself is employed as a law enforcement officer, cannot, as a matter of law, give rise to distress so severe that it surpasses the threshold of what a reasonable person "could be expected to endure." *See Sena v. Commonwealth*, 417 Mass. 250, 264 (1994) ("Neither applying for an

arrest warrant, nor making an arrest pursuant to an issued warrant can be considered 'utterly intolerable in a civilized community.'").

## VI.  Negligent Infliction of Emotional Distress

To recover for the negligent infliction of emotional distress, a plaintiff must prove the following: "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." *Payton v. Abbott Labs*, 386 Mass. 540, 557 (1982).  A plaintiff is required to "corroborate [his] mental distress claims with enough objective evidence of harm to convince a judge that [his] claims present a sufficient likelihood of genuineness to go to trial." *Sullivan v. Boston Gas Co.*, 414 Mass. 129, 132, 137-138 (1993).  *See Rodriguez v. Cambridge Hous. Auth.*, 443 Mass. 697, 702 (2005) ("[I]n the *Sullivan* case, we did not eliminate the physical harm requirement, but merely expanded the range of symptoms that may provide the type of objective evidence to prove physical harm to include symptoms that could be classified as more 'mental' than 'physical.'").

Defendants contend that Davila-Lynch has not shown that he was physically harmed during his arrest.  Davila-Lynch does not dispute defendants in this regard, but argues that the consequential distress that he suffered because of the defendants' conduct caused him to lose weight and sleep, and inhibited intimate contact with his

wife. Based on these symptoms, a jury could infer that Davila-Lynch suffered physical harm, thus precluding summary judgment on this claim. *See Gutierrez v. Massachusetts Bay Transp. Auth.*, 437 Mass. 396, 413 (2002) (compiling cases – objective manifestations include symptoms such as uncontrollable crying spells, loss of a sexual relationship, gastrointestinal distress, tension headaches, and depression); *Bresnahan v. McAuliffe*, 47 Mass. App. Ct. 278, 285 (1999) ("Here, the plaintiffs suffered stomach pain, nausea, body shakes, and reduced libido, distress sufficiently particularized to qualify as physical manifestations of harm.").[13]

## VII.  Assault and Battery

"An actor is subject to liability to another for assault if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension."  Restatement (Second) of Torts § 21.  Defendants correctly point out that Davila-Lynch by his own admission was not subject to a harmful touching.  *See* Davila-Lynch Dep. at 102.  To the extent that the officers used force in effecting the arrest that might be deemed subjectively offensive, they were privileged

---

[13] The court notes, however, that the claim for emotional distress merely states as a freestanding cause of action a damages component of the § 1983 claim and might also be dismissed by plaintiffs prior to trial.

to do so. *See Commonwealth v. Young*, 326 Mass. 597, 601-602 (1950). Consequently, this claim will be dismissed.

## VIII.  State Civil Conspiracy

Massachusetts recognizes two types of civil conspiracy, so-called "true conspiracy," and conspiracy based on section 876 of the Restatement (Second) of Torts. *Kurker v. Hill*, 44 Mass. App. Ct. 184, 188 (1998); *see also Grant v. John Hancock Mut. Life Ins. Co.*, 183 F. Supp. 2d 344, 362-363 (D. Mass. 2002).  Under the first theory, Davila-Lynch is required to show that the "defendants, acting in unison, had 'some peculiar power of coercion' over [him] that they would not have had if acting independently." *Jurgens v. Abraham*, 616 F. Supp. 1381, 1386 (D. Mass. 1985).  Davila-Lynch argues that this standard is met here, insofar as Celia ordered Dickinson to stop Davila-Lynch, to subject him to field sobriety tests, and then to arrest him.[14]  However, these allegations are insufficient to demonstrate that the officers had a peculiar power of coercion over Davila-Lynch that they would not have had if acting independently.

The second type of civil conspiracy, based on section 876 of the Restatement, is a form of vicarious liability for the tortious conduct of others.  *See* Restatement

---

[14] Defendants make no argument as to why the state civil conspiracy claim should be dismissed.

(Second) of Torts § 876;  *Massachusetts Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 62 F. Supp. 2d 236, 244 (D. Mass. 1999).  Massachusetts courts have recognized two theories of liability under section 876:  (1) "concert of action," and (2) "substantial assistance" or "aiding and abetting."  *See Maruho Co., Ltd. v. Miles, Inc.*, 13 F.3d 6, 9 (1st Cir. 1993); *Payton v. Abbott Labs*, 512 F. Supp. 1031, 1035 (D. Mass. 1981).

Under the substantial assistance theory, a defendant is liable for the conduct of another if he "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Restatement (Second) of Torts § 876 (b), quoted in *Kurker*, 44 Mass. App. Ct. at 189. To recover under this theory, the plaintiff must establish two elements.  First, the defendant must give "substantial assistance or encouragement" to a party engaging in tortious conduct.  *Payton*, 512 F. Supp. at 1035; *Haemonetics Corp. v. Dupre*, 238 B.R. 224, 228 (D. Mass. 1999).  Second, the defendant must possess an "unlawful intent." *Payton*, 512 F. Supp. at 1035.  Unlawful intent comprises two distinct mental states:  knowledge that the other's conduct is tortious, and an intent to substantially assist or encourage that conduct.  *Id.*

Davila-Lynch argues that Celia and/or Dickinson knew that the conduct of the other breached a duty to Davila-Lynch, and that Celia and/or Dickinson gave

substantial assistance or encouragement to the other.  As discussed previously, there is a dispute of material fact as to whether the officers possessed an unlawful intent to arrest Davila-Lynch without probable cause, thus precluding summary judgment on the second variant of the civil conspiracy claim.

## ORDER

For the foregoing reasons, defendants' motion for summary judgment is ALLOWED as to the claims for intentional infliction of emotional distress, assault and battery, and malicious prosecution.  The court hereby BIFURCATES the municipal claims for resolution (if necessary) after the trial or disposition of the underlying claims. The motion for summary judgment is DENIED with respect to all remaining claims.[15] The clerk will set the case for trial.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

[15] While not raised by defendants, Laura Davila-Lynch's loss of consortium claim is not sustainable as a cause of action to the extent it is derivative of Jeremiah Davila-Lynch's civil rights claims.  *See Wojcik v. Massachusetts State Lottery Comm'n*, 300 F.3d 92, 96 n.1 (1st Cir. 2002), citing *Tauriac v. Polaroid Corp.*, 716 F. Supp. 672, 673 (D. Mass. 1989).